And I get my frequent listener card for this case, since I was on the first panel. Ms. Curtis? Good morning, Your Honor. I'm Martha Curtis, representing the plaintiffs Mary Smith and 38 other retirees. As Judge Haynes knows, these retirees were promised medical benefits without premiums being paid by them for the rest of their lives. These people had worked for 30 years, starting in the 70s, and this was part of their promise by their private employer, NOPSI. I'm going to address what we believe should be the correct test to address the instrumentality and agency governmental plan exemption from ERISA. My co-counsel addressed the Internal Revenue Code factors, if the court finds that those factors should apply. First, it's undisputed that this is an ERISA plan. In Hightower, this court said the initial inquiry should be the language of the statute itself. A governmental plan is a plan established and maintained for its employees by the U.S. government, state government, political subdivision, agency, or instrumentality. I just emphasized the word its because you're arguing that RTA maintained the plan for Temsley's employees, and therefore it depends on what the meaning of its is. However, in the district court, you conceded that if Temsley was an agency or instrumentality of the state, then you're done. So have you invited error, waived error, whatever, whatever on this its argument? If we can go past – I want to go past RTA and go – I agree with Your Honor. I believe that RTA should be done and not addressed because it doesn't maintain it for its employees, and I believe the focus should be if Temsley is an agency or instrumentality, then we're done, we lose. So I think the focus should be on Temsley and whether Temsley is an agency or instrumentality. But see, I thought your argument was that Temsley being the employer has to also be the maintainer. No. That's not your argument. No. Temsley – Knopsey established it, and then Knopsey became Temsley. Temsley did maintain it. Temsley did maintain it for its employees. Okay, so you're not making that argument. No, I'm saying RTA never maintained it for RTA's employees. Okay. So RTA is a red herring. It doesn't matter if it's a public subdivision. It doesn't matter if it's an agency. It doesn't matter if it's instrumentality. Okay, so that's what you meant by it. Okay, fine. Good. So I want to focus on, if we can – if you have any questions about that, that they are definitely not the employees. You should follow Ali of Justice Ginsburg because Justice Ginsburg focused on the governmental – the employment relations test. And it does not matter whether it's a federal government or a state government. When the Congress – when we go back to Hightower, start with the language of the statute itself, the language of the statute doesn't say agency instrumentality when it's a state is different than agency instrumentality. But Judge Ginsburg did say that. She said it may. She said it may. And she had the right to reject. She could have adopted the IRS factors. And after her opinion, the closest case to our case, almost exactly the same facts, is the McGraw case from the Tenth Circuit who takes Ali, takes it, and does apply it to a state issue. Did the Tenth Circuit discuss the Rose factors? Did they say that test is inconsistent and wrong? They discussed the Ali factors, which they – The question is, did they say the Rose factors are inapplicable? They didn't say the Rose factors are inapplicable, but they said the Ali factors are applicable, and they were talking about a state case. And the Ali factors – I mean, if you read Ali and you read Justice Binkler's opinion in the footnote 11, certainly the Tenth Circuit would have, if they thought federalism was – Maybe unless it's just very fact-specific, like in Wilcox for us. If you look at the facts in McGraw, right, it was a Japanese company that had a sub that had an ambulance company that was just regulated generally. That, you could just say, is factually so dissimilar that it's in the private world, whereas here, apply the Rose factors, and this is highly governmental. And actually, I think we are similar to McGraw. The parent company was ATE, Management Services Company, Inc. It was a transit management firm from Chicago, Illinois. That's who the RTA contracted with, ATE. And they told ATE, we want you to create a sub called TMSL. And it's in the record, the declaration from Mr. DeVille, who was the CEO of TMSL, in the record says, ATE formed TMSL to preserve TMSL status as non-governmental employees under the NRA and ERISA. That's the CEO of TMSL says that this foreign, foreign state, Chicago company formed a local subsidiary in order to preserve the NRA rights and the ERISA rights. That is in the record, and it's undisputed, and it's from the CEO. You know, this again goes back to the whole burden of proof. We have in the record the Cooperative Endeavor Agreement, which says TMSL is an independent contractor. The Cooperative Endeavor Agreement also has a whole section on how disputes are going to be resolved between TMSL and RTA. If TMSL is so controlled by RTA, if it's such an agency or instrumentality RTA, why do they have a whole section about how we go to the American Arbitration Association to resolve disputes? It is just a contractor, just like the contractor is in McGraw. McGraw, it was the Emergency Medical Services Authority, decides to contract with Life Fleet to supply its personnel to drive around its ambulances. What has to do with the Cobol decision, the Third Circuit Cobol decision? The Cobol decision actually is different because those employees were employees of a political subdivision. It goes off in saying it's a political subdivision and it's its employees. If you read it carefully, it goes off and talks about that the authority was a political subdivision, not an agency or instrumentality. It says that it was an authority that has powers to tax, eminent domain. It goes through it as a political subdivision. McGraw is the one that talks about instrumentality or agency of the state. RTA gets tax revenue, doesn't it? I'm sorry? Because the RTA, the record, Judge Barbier made findings that RTA- It may, it may, it may, and Mr. Clayton was going to address that on the IRC factors. But it may have the authority to tax. But again, to us, the RTA is irrelevant. We're not talking about the RTA. These were not employees of the RTA. There is, they retired in 2009. These people were employees of the New Orleans Public Service, Inc., which was an electrical company, now part of Energy. They put in their time. They worked hard. They're retirees. And just because years later somebody does something, they say, well, now you're a governmental employee. But they're not, and RTA does everything in the record. It has disavowed them as an employee. It's the, I want to also cite the Management Service Agreement at Record 426. You're saying they're not getting the benefit of being state employees, only the detriment here with the exemption. The whole thing about the federalism concerns in the governmental plan, Your Honor, was that they said, you know, most of these pension plans for governmental employees are so much better than anything you could have in the private market, and we don't want to tinker around with them. Let the states deal with their own employees, the teachers, the firemen, the policemen. We don't want to tinker with these. They've been longstanding. This was to address private company relationships. These people worked for private companies. They worked for Knopsy. They worked for Temsel. They never worked for RTA, and Temsel's not an agency under gentility. Okay, you've split your time with Mr. Clayton. I thought you'd like to address the IRS factors. Thank you, Your Honor. May it please the Court, good morning, Your Honors. My name is Josh Clayton, also representing the plaintiffs in this matter. So I assume since you're here, you're going to say even if we do apply the IRS factors, you win. That's correct, Judge. That's really what I want to focus on. I'd like to get to one point that the panel raised a few moments ago relative to the power to tax as to RTA, and I think that's an excellent point because I'm sure as this Court well knows, this Court said in the Hightower decision that government plans receive an exemption from a risk because of their ability to tax and thereby to avoid the pitfalls of underfunding. And in this case, when we look at Temsel and when we look at the RTA, Temsel has no power to tax. There's been no allegation. There's nothing in the record indicating at all that Temsel has the power to tax. When you look at the RTA, Louisiana Revised Statute, Title 48, Section 1664, we discussed this in our briefs, says the RTA may not levy a tax unless it has first been approved by a majority of voters voting in such election in each of the parishes having membership in the authority. And I believe there's either four or five parishes, and we'll go through recitation, but the point being that there is somewhat of a limitation on the power to tax even as the RTA, because there's got to be approval by not just one parish, five parishes. So that is, I think, an important factor. If we are applying Hawkins County in the NLRB test, if we're applying it, are we then just reviewing for clear error? If we're applying – Because just Barbier went through each one of the factors, and it would seem to me our review standard for those would be did he commit clear error in his findings of fact as to – you have a thought on that? Yes, Judge, that's an excellent point. I think that as to – that's correct. Judge Barbier did apply NLRB slash the Hawkins test to the RTA's political subdivision. And our position, again, is not to sidestep Your Honor's question, but I really think it contends with whether or not they're an agency or a municipality without that central – So you don't care about RTA? We're just putting that to the side. Unless Your Honor has a follow-up question, I'd really like to focus on the agency or municipality factors. Let me ask you this. On the question of which test we use, alley or revenue ruling, would you agree there is already a circuit split on that, so we would not be creating one regardless of which test we pick? I would agree with that, Your Honor. There is a circuit split currently. The split is not yet resolved. Right, but the point being we're not creating the split. It's already out there. We would just be furthering it. But you're going to tell us why we don't need to further it because you win either way. So tell us that. Fair enough. Thank you, Judge. So just starting right off the box with factor number one, governmental purpose, governmental function, it can't be just because – if just the mere fact that you have an industry or you have a particular entity that's serving an arguably public function, if that makes the entity an instrumentality, taxi companies would be instrumentalities. That can't be it. I'd like to invite the Court to say let's look at some of the other purposes that are undisputed. What was the ultimate purpose for TINZL's creation? All we have to do to look at it is we go to the Cooperative Endeavor Agreement. Your Honors, this is in the record at page 464, and I can quote from the Cooperative Endeavor Agreement, the reason that the RTA required ATE, Management Service Company, to create TINZL was, quote, to ensure the terms of transit workers' collective bargaining agreements would be honored. RTA required ATE to form a wholly owned subsidiary, close quote, TINZL. Now, what's the import of that? What that means is the RTA wanted federal funding. We've got a transit system to operate, and under the Urban Mass Transportation Act, we've cited those – the applicable statutes or provisions in our briefs. We've got to ensure that collective bargaining rights are honored, and we can't – we, the RTA, cannot do that. If we're a public entity and we hire – if we directly hire these people, then you've got the governmental employer NLRB exemption, and we can't do that. So we've got to have ATE with who we have a – we, the RTA, have a contract. We're going to say ATE, you form TINZL in 1983, wholly owned subsidiary. What about – what happened after 2009? Where is TINZL after 2009? I think that's an excellent question, Judge, and I think it highlights – I mean, who has the assets? Who has the cash after 2009? I think it's an excellent question, Judge. It really underscores the nature of the factual dispute here. The defendants have argued – and the dissolution agreement from 2012 – that's the stock agreement from 2012 – does say that – recites that TINZL ceased operations in 2009, and yet – and I don't know if I have the pinpoint site in front of me, but I believe it was Mark Major, the former GM of TINZL, who pointed out and reviewed documents and said, let's look at what the financial statements for TINZL say. You've got 2011 – let's take that particular year – financial statements that show millions of dollars in operating expenses, medical expenses for – So you're disputing that TINZL ceased operations in 2009? I think that's a potential valid dispute based on the record. Is that a potential dispute, or are you disputing – I think it is – I think it's a genuine factual dispute. Yes, Your Honor. I do. So your answer to Judge Riegle is you don't know what happened to TINZL in 2009. I don't know as I stand here today, Your Honor. I think it needs further factual development. And I think, again, just to come back to it, other purposes for which – just under Factor 1, but just – TINZL was used by its parent companies to earn management fees for those parent companies. Obviously, it almost seems – it goes without saying that TINZL earning management fees for its wholly owning parents, that's not a public function. Just to jump ahead really to Factor 2, performance on behalf of a political subdivision. Again, TINZL's performance was on behalf of the private companies that wholly owned it from 1983 until 2012. And again, I'd like to emphasize – I don't know if Ms. Curtis might have mentioned this, but – 2012, that doesn't – a stock purchase in 2012 can't abrogate – it can't – vested claims. We have denial of benefits that starts in 2006 and goes through the present. So you've got at least a six-year period – well, roughly a six-year period in which a stock purchase by a government entity, RTA, for the sake of argument, assuming that RTA is a government entity, can't abrogate. It would totally go against the remedial purposes of ERISA that this Court has repeatedly said have to be a guided influence. It would be against those principles to sort of just wipe those prior violations away, so to speak. Before you give out of time, if you – if we say this is not ERISA, we don't have jurisdiction, what do you have left to get your – what you're seeking in state court? Well, I think in state court, I would say – I would humbly submit to Your Honor, first of all, that at the least we have an alternative Section 1983 claim that we've pled that's not prescribed, that's not – the statute of limitations has not run as the judge found, because in January 2012 – we cite this in our papers – premiums increased by several hundred dollars for several – that's a new cause of action that arose. We filed suit less than a year later, December 31, 2012. So we have a federal Section 1983 claim. Now, to answer Your Honor's question directly, as to state law claims, you know, there's – the defendants just said they're the summer judgment movement. They haven't borne – they haven't carried their burden of showing that there are alternative state law remedies. They said that there was a state court suit filed. It was stated in their request pending this appeal. That's what I would submit, Judge, on that. I see I'm out of time unless Your Honor has any further questions. I'd be glad to answer. Okay. Thank you. Thank you. Good morning, and may it please the court. It's the court's lucky day to go from FERC to ERISA. Part of the problem that plaintiffs – plaintiff appellants are trying to create by what I view as sleight of hand is continually confusing RTA and its designation unquestionably undisputed as a political subdivision. And TIMSL, which Judge Barbier found based on undisputed material facts in front of him, was an instrumentality of a political subdivision. And what you just heard in argument is a kind of a bouncing back and forth as to which standards apply. Well, they're not bouncing back and forth. They're trying to say that whether we use ALLE or we use the revenue ruling factors, they still win. I wouldn't call that bouncing. They're arguing for ALLE. And you really can't win under ALLE, can you? You can't really make the same statement that you win either way. I can't lose. I can be sent back to the district court for discovery to occur, but I can't lose. Well, that's a nice place to be. So you're saying that if we decide the ALLE test applies, we have to vacate and remand for consideration of the ALLE factors. Yes, there's no motion pending that would grant relief to plaintiff appellants. And, Your Honor, when you look at – How could they win? You would know. Are they members of the employee retirement system, civil service system or not? They are not. So how could they ever win under – how could you ever win under the ALLE system? I haven't started considering all of my options there. And in part, Your Honor, I haven't because it's very clear that this court should apply the six-factor test. We start with basic – Well, let me just ask you this. It seems kind of weird to me to say you are not state employees for virtue of pension, civil service, and the whole list of things that goes with being. I mean I used to be a state employee when I was a state district judge. So there's a whole panoply of benefits and detriments, if you will, of being a state employee. And these guys get – men and women – I'm using guys generically – get none of those benefits. Okay? So how can we really say you're employees of a government of any kind – agency, instrumentality, anything else – when you're not entitled to a lick of benefits for that? That just seems kind of like, you know, Dan, if you do, Dan, if you don't. I'm sorry, Your Honor. They are entitled to benefits. Okay. What state sort of civil service benefits slash detriments are they subject to? No, Your Honor. They have their own plans. The only thing that's happened in this welfare benefit plan is instead of receiving 100 percent paid premium, they now have to pay 12 percent. That occurred after the ridership of Timsel and RTA was slashed after Katrina. After Katrina and still to this day, in one week, the ridership is not what it was in one day before the storm. The managers of this system who were dependent on state funding – and Timsel has no funding. Timsel, Your Honor, has no assets. Timsel only has employees, and now Timsel has no employees either. But there's a lot of – And so your question adds to $2,000. But there's a lot of programs that get state or federal funding that doesn't turn those employees into employees of an agency or instrumentality to state. I'm not questioning the problems that Katrina caused in the least. What I'm saying is how can we view these people as employees of an agency or instrumentality of state where they were in no way treated as such in any way similar to other state employees? I disagree, Your Honor, that they were not treated as an instrumentality of the Regional Transit Authority. In fact, the agreement that was mentioned by my learned colleagues, the Cooperative Endeavor Agreement, makes it very clear that Timsel itself is controlled completely by RTA. And, of course, RTA depends on the public fisc. And Timsel has no money, has never had any money, and has always been controlled by RTA. Does the record show that Timsel's never had any money? Yes, Your Honor. I believe there's testimony from Mark Major about that point. Timsel never, Your Honor, had any assets of its own. It was always dependent upon monies from the RTA. I believe that Judge Barbier stated that specifically. But if you look at the Cooperative Endeavor Agreement, which can be found in the record at pages 464 through 481, it shows that Timsel is subordinated to RTA's budget control. The advice and consent of RTA is necessary for the hiring of any key Timsel personnel. Does the record or did Judge Barbier find specifically where the money that's used to fund the plan now and in 2006 came from? Was it connected back to taxpayer money? I don't believe that that is in the record, sir. Okay. Going on about – but it is in the record, and there's been no showing to the contrary by plaintiff appellants that Timsel has any assets or money. Where does the bus fare go? So, like, if I would ride a bus in New Orleans in 2006, if I got on a bus in New Orleans and I put my coins in the drop box or whatever, what happened to it? Section 5.4 of the Cooperative Endeavor Agreement, all revenue from the transit system belongs to the RTA. Okay. So, the money flows through RTA, and you're saying that RTA is itself a political subdivision, and therefore that makes Timsel an agency or instrumentality. And the reason that that is so is because Timsel hits every one of the six IRS factors. And one of you asked, well, why the IRS factors? Well, Your Honors, Internal Revenue Code section 414D is the parallel authority to the exclusion under ERISA for governmental plans. As the bench knows, the Internal Revenue Service is given the authority in many areas to make determinations about ERISA. The Internal Revenue Service itself refers to Revenue Ruling 57-128 to resolve questions about instrumentality. And when you go to the factors on instrumentality, and that six-factor test, of course, was discussed at length. But didn't Timsel itself file Form 5500 Disclosures, which are for ERISA plans? Timsel did that. There's no doubt, Your Honor. Okay. So we're not supposed to look at that? We would refer the court to two cases that are not controlling on this court because they are district court cases. The Hall case, which is a case decided in the District of Maine, and the Michel case, M-I-C-H-E-L, a Judge Livaday decision in the Eastern District of Louisiana. Both of those cases make the point. Even if you try, even if you say, I am going to function as an ERISA plan, you either are or are not. And the fact that you file a Form 5500 is not material. And the Hall case and the Michel case are very well reasoned as to those points, Your Honor. Okay. Would that turn on whether we treat this governmental plan concept as sort of analogous to an insurance company exclusion in a policy? So in a policy, you have coverage, and then you have exclusion from coverage. And so I think their argument is here you have a plan, and then you have sort of an exclusion from the ERISA program, and therefore it's an affirmative defense on you. And therefore it might matter whether you meet the original terms of a plan, which this seems to. This seems to meet the original terms of a plan but for the governmental exemption, which then they argue is an affirmative defense that you have to prove. Well, two points – a couple of points. First of all, I believe you yourself told me that proving ERISA was an element of their case. But I don't want to quibble with Your Honor about whether it's an affirmative. We weren't addressing this point. We were addressing whether this is a question of subject matter jurisdiction or 12B6 type motion to dismiss. We were not addressing who has the burden of proof on governmental plan. I agree with that. I agree with that. So it's not in – it's not in Smith-Watt. Okay. First of all, it's very different than an insurance exclusion. We're looking at a specific provision of the statute. And the statute says a governmental plan means a plan established or maintained by the government of any state or political subdivision or any agency or instrumentality. This is not an insurance policy provision. This is the law of the United States. Second, as to the point about – Yeah, but the law of the United States can have things plaintiffs have to prove and things defendants make as defenses. I mean to me that doesn't answer the question of whether this is an affirmative defense or not. The fact that the United States makes a law. Going to that point, we submitted it's not an affirmative defense. Their burden is to demonstrate that there's an ERISA plan here. Well, I think they've done that except if the governmental plan applies. So that strikes me as sort of a quintessential affirmative defense. You have a set of facts that would be a winner except limitations has run or res judicata applies or accord and satisfaction. That's quintessential affirmative defense. It can't be a – if you're not an ERISA plan, we have negated an element of their case. Setoff and res judicata are good examples of affirmative defenses. But here all we have done is negated the affirmative element of their case. And I'd like to go back because one of the other points Your Honor was making was that it just doesn't seem fair that the plan may have been ERISA and then became governmental. We'd ask the court to consider Hightower and we'd ask the court to consider the specific language of the governmental plan definition. It obviously contemplates that over periods of time entities are going to change. There's going to be a shift from an ERISA plan to a governmental plan. That's exactly what happened in Hightower except it was the opposite. It started as a governmental plan and became an ERISA plan. That's why the statute reads this way. And then the other issue that plaintiffs tend to focus on is, well, somehow their rights are being taken away. Their rights are being transformed. Instead of a federally based lawsuit, they now have a lawsuit based on Louisiana law. And that is fair and appropriate, Your Honor, because RTA is a political subdivision of the state of Louisiana and TMSL is its instrumentality. So among the causes of action, Your Honor, that they have under the Louisiana law, they have breach of contract. They have misrepresentation claims. I have to candidly confess I'm not a state court lawyer. I usually spend my time in federal court. But I know one thing. My clients like it better when I spend time in federal court because state courts tend to have more liberal causes of actions and claims. The plaintiffs have already filed suit in state court. They filed their lawsuit after oral argument before Judge Barbier and before the decision came down. That's a matter of judicial notice and it's a public record. So just jumping to the IRS factors. Yes, sir. Governmental function, transit, public transit, that's it. Yes. Ownership. Oh, it's more than that. Go ahead. I'm sorry to interrupt. State ownership. What's your best record site for that? And then statutory authority as of 2006. Okay. State ownership. My record site for that is the Cooperative Endeavor Agreement. The Cooperative Endeavor Agreement spells out distinctly how the RTA, a political subdivision, controls the instrumentality that is TINSA. And by the way, this control is not anything new, Your Honor. If you look at Record 71-72, on March 17, 1983, a long time ago, before the June 1983 benefits agreement was signed, the head of RTA writes a letter to the president of ATU Local 1560 and tells him all the union employees are going to be transferred to TIMSO. This just shows the kind of historic control RTA has exerted over TIMSO employees. But there's more. There's the fact that the RTA controls who's going to be the general manager of TIMSO and the deputy general manager. This, again, is the Cooperative Endeavor Agreement. Interregional, which, as you'll see if you read… Was there statutory authority for TIMSO in 2006? In 2004, TIMSO was recognized as a political subdivision of the state of Louisiana. That was done for litigation purposes. And it's also instructive, Your Honor, why would the state legislature designate TIMSO as a political subdivision? Frankly, it wanted to shelter TIMSO from jury trials and certain other tort-type results that the state deemed were better off not happening because the RTA is liable and responsible for all of TIMSO's debts and litigation expenses. So, naturally, you can see that this designation of TIMSO as a political subdivision by the state of Louisiana, admittedly, Your Honor, for different purposes than this case focuses on, just demonstrates that TIMSO is viewed by the Louisiana state legislature as an entity that needs protection for the fisc of RTA. Going back to the Cooperative Endeavor Agreement, TIMSO may only amend its Articles of Incorporation and bylaws with RTA approval. I talked about the fact that all revenue from the transit system belongs to RTA. Section 5.6, the RTA controls all litigation. And at the termination of the Cooperative Endeavor Agreement in Section 6.6, the RTA becomes the 100% owner of TIMSO's stock. And- I'm slightly concerned just about the limiting principle. In other words, if we accept that this was an ERISA private plan, NOPSI employees, right, originally. Yes, sir. And then they're excluded from civil service benefits at least largely when- Because they have their own plans through TIMSO. With the litigating position being that transit's saying it's still an ERISA plan, whether that has any effect or not. Then you get Katrina, the unexpected moment, and the revenue sources are tight. Your position is that a public entity, because it's got the taxpayer base, can take over that private plan and it gets government exemption from ERISA consequences, at least in federal court. Yes, that is our position, Your Honor, and we believe- Look at Hightower. In Hightower, there was a change in a lease. And then there was an argument about the reversion rights of the pension plan. And in Hightower, it started off as a public entity and then became a private entity. But the language that uses the disjunctive phrase or in the governmental plan exclusion permits both what happens in Hightower and what happens here. The consequences get very harsh if the assumption that the taxpayer will always bail them out stands behind the sort of federalism concern. The taxpayer, yes, it does get harsh, but the taxpayer- When RTA, what properly should happen, and I'm hoping, of course, that this court will affirm Judge Barbier in full, then we're going to be sued. RTA and TIMSO are going to be sued in state court. And many of these same causes of actions under different labels are going to be fought over, and you will have whatever result you have. They will not have a cause of action under ERISA, but they will have Louisiana-based causes of action. Okay, thank you, Counselor. Thank you very much.  Yes, I first wanted to respond to some of the questions raised by Judge Hickinson about deference to findings of fact of Judge Barbier. This is on motion for summary judgment. This is one of the issues we have. There shouldn't be any genuine issues of findings of fact that we should give any deference to. It should be de novo on the law. Where is there a genuine issue of fact that RTA does have tax authority and ultimately is responsible for all debts that transit incurred? On the RTA, I thought you were saying overall to defer to Judge Barbier and everything he said- Just fact by fact, each of the factors. Are all debts that TIMSO or transit, are they backed up by RTA? Yes or no? Is there any conflicting evidence as to that? I think there is. Oh, there is. Okay. What would you point to? Where would you point to? I think that there will be more evidence on that. Will be more or can you point us in the record? I don't think in the record right now there is- Well, isn't that a problem because we've got to go with the record we have. If the record we have doesn't have a factual dispute, that doesn't look good for you. Okay, the factual dispute I have is one of the things Judge Barbier says early on is that RTA is a sponsor of the plan. That's one of the first things he says is one of his facts. It's a sponsor of the plan. This form 5500 from 2007 signed by Mark Major on December 31st, 2008 says plan sponsor is TIMSO. It doesn't say it's RTA. So you're saying the factual dispute is that the facts are contrary to what he cited? At least on that evidence. I mean at least on that particular point. Are you contending that TIMSO and or RTA are stopped by their filing of the form 5500? I believe it's evidence that it was an ERISA plan. But not a stopple, just evidentiary of. I believe it's evidence of ERISA plan and it's also evidence of who the sponsor was in 2008. It's a 2007 document. And again, ERISA is supposed to be liberally applied to protect the retirees. Why should they be able to rely on documents? We talk about IRS. Mr. Shapiro made a good point, which is typically the plaintiffs want to be in state court doing ten different causes of action. The defendants want to be in federal court saying it's ERISA. Why do you want it to be ERISA? One of the reasons these particular plaintiffs want it to be ERISA, Your Honor, is because ERISA also gives them attorney's fees. These are retirees who have no money to pursue this action. They just don't. And when Mr. Shapiro says, oh, it's no harm to them that they didn't have to pay 100 percent of their medical insurance premiums as older people. And now they have to pay 12 percent? I mean, that – let me tell you, I talk to these people. They write these declarations from $100 to $400. If you were listening to the first argument, I agree that when you have to pay for something you could otherwise pay nothing for, that's a difference. So I don't think we're disputing that. I think the question that we're looking at is what effect do all of these filings have on this point? And you're saying it's not estoppel, it's simply evidence. Yes, Your Honor. Okay. And then – Back on disputes of fact, could you have your brief in front of you? I can grab it, Your Honor. On page 22, at the top, there's a footnote 3 at the top of the page. Oh, Your Honor, what that is – What's that? And I'm sorry, that was my idea. Maybe it was totally – didn't go well. No, it makes an important point. I just wanted to know. What we did is we did a PDF of the filing Timsel filed in that case in federal court where Timsel itself, in federal court, in that case against GIA, said, I am not going to risk a plan. I am not an instrumentality. I am not an agency. So that – what I was trying – and I guess it looked like we were trying to do a footnote. But that's in the record below? Yeah, that's in the record. But it was, to me, so important. It's a judicial admission by them. It's one of these things, Your Honor, again, most of the time, yes, maybe plaintiffs want to be in federal court on ERISA. But then when you have – Okay, so that's why I'm asking, given the point that Judge Higginson made, are you contending there is a stop to change their story? I believe it's a judicial admission, that. That's from 1996. So the issue then, Your Honor, is what you're talking about is now a private entity. Let's assume RTA, public subdivision, and now they're there. Okay? And what effect does that have? Katrina happens. Now they're there. Well, what if something else happens? Can the government go around now and buy up GM pension plan, Shearer's Roebuck pension plan, Walmart pension plan, every other private pension plan if something bad happens and then no one has remedies under ERISA? I mean that's what comes from that argument. If just the government can do it, if something bad happens, makes a private plan a public plan, then every time a private plan can ultimately be a public plan and ERISA falls apart. Okay. Your time is up. Thank you so much. In the old days, as a state court judge, I could have spent the afternoon on this, but we will not do so.